**UNITED STATES, Appellee,**

v.

**Michael D. TALBERT, Major, U.S. Air Force, Appellant.**

No. 64,340.

ACM 27743.

U.S. Court of Military Appeals.

Argued Jan. 9, 1991.

Decided Sept. 20, 1991.

For Appellant: *Major Bernard E. Doyle, Jr.* (argued); *Lieutenant Colonel Jeffrey R. Owens* (on brief); *Colonel Richard F. O'Hair.*

For Appellee: *Major Paul H. Blackwell, Jr.* (argued); *Lieutenant Colonel Brenda J. Hollis* and *Lieutenant Colonel Barret E. Kean,* USAFR (on brief). ·

*Opinion of the Court*

EVERETT, Senior Judge:

Pursuant to Major Talbert's guilty pleas, a military judge sitting alone as a general court-martial at Carswell Air Force Base, Texas, convicted him of three specifications of conduct unbecoming an officer and a gentleman, in violation of Article 133, Uniform Code of Military Justice, 10 USC § 933. The sentence to dismissal and confinement for 10 years was approved by the convening authority. On December 20, 1989, the Court of Military Review in an unpublished opinion affirmed the findings but, as a matter of sentence appropriateness, cut the confinement in half and affirmed the dismissal. We granted review on this issue:

> WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY ADMITTING INADMISSIBLE EXPERT OPINION EVIDENCE ON CHILD SEXUAL ABUSER PROFILE.

I

The three unbecoming-conduct offenses involved taking indecent liberties at various times with three little girls. During the providence inquiry appellant admitted wrongfully removing, adjusting, or rearranging the articles of sleepwear that they

were wearing and the bedsheets that were covering them; exposing their pubic areas and buttocks; and then photographing them in that position, with intent to gratify his sexual desires. Also, he had videotaped one of the girls with her private parts exposed.

Pursuant to a search authorization, Agents of the Office of Special Investigations had seized from Talbert's bedroom a locked briefcase, which contained over two hundred pedophilic items that he had amassed. These included a videotape involving one of the victims; sundry photographs of each victim with her private parts exposed; scores of other pictures of young children in various stages of undress; countless pictures of female and male toddlers in swimsuits; voluminous clippings from catalogues and other ads of children wearing swimsuits and modeling other clothing; numerous pages from catalogues displaying children's clothes; several cutouts from paperback books concerning sexual abuse of young children; a newspaper article about a child-abuse conviction which a court had overturned; and a videotape of part of an NBC News Special entitled, "Silent Shame."

At the outset of the presentencing phase of the trial, these exhibits were readily admitted into evidence. Indeed, defense counsel objected to only six of the more than two hundred exhibits; and this was on the ground that their seizure had exceeded the scope of the search authorization.

Eventually, trial counsel called two expert witnesses. The first, Ann F. Clark, was the supervisor of Sexual Abuse Investigations for the Texas Department of Human Services. She had a Bachelor of Arts degree in social work and a Master's degree in child development and had received over 900 hours of training in the field of child sexual abuse. The defense counsel specifically declined to question her qualifications.

Based on some of the exhibits that she had seen, Clark opined that Talbert was a "[p]referential child molester"—which she defined as an individual who is sexually oriented toward children. According to her, such molesters use photographs of children—whether nude or not—for sexual gratification; they collect pictures of "skimpily clad" children. "Basically that person's overriding ambition is to have sex with children. They fantasize about it and masturbate to pictures. They seek out situations where they can be near children." The pictures are "just another step then before they will be sexually abusing these children."

Some of the pictures indicated "an obsession with death." This caused Clark "a great deal of concern, and if one of my staff were investigating a case and they came across these materials coupled with these other materials, I would be very, very concerned about the safety of that child and other children." Clark was unaware of any therapy for pedophilia that "had a high success rate."

On cross-examination by civilian defense counsel, Clark conceded that for a sex offender to acknowledge the problem was "one of the very first steps to getting help." Moreover, it was "a good sign" that the pedophile sought help on his "own and not under coercion."

Seth L. Goldstein, the prosecution's second expert witness, testified that he was an investigator for the District Attorney's Office in Napa County, California, and managed the child-abuse program there. Primarily his job was to investigate cases of child sexual abuse and to support the courtroom presentation. He had spent over a thousand hours in this field and had written a book, *The Sexual Exploitation of Children.*

Goldstein had viewed the videotape of one victim and various other exhibits. He described what he inferred from the videotape about the actions of the person taking it. When he opined, "It appeared as though the camera was moving in with some kind of rhythm, consistent with body shaking, as if somebody were masturbating[,]" defense counsel unsuccessfully objected that the witness was "going a little

bit too far, speculating why this thing was rocking."

Goldstein testified that the purpose of the sexually explicit photograph of a child was "for the sexual gratification of the viewer." He inferred that the videotape had been taken by "[s]omeone willing to commit a crime without the consent of the victim." Fantasizing with child pornography poses a danger to the community because the offenders "are constantly looking for more; which means more victims."

According to this witness, some of the photographs corresponded to portions of the videotape; and from this he inferred "that the offender sometime before, during or after has physically touched the child for sexual purposes, ... " The defense "object[ed] to any further testimony concerning possible touching of the child", because appellant had not been charged with any such contact. The military judge "overrul[ed] the objection" but explained:

I appreciate the concern. There has been evidence before the court, including the *Care* inquiry of physical contact obviously with the clothing, and I am going to be very, very cautious about making any assumptions that there was any other kind of physical contact, but I am going to allow the testimony from the witness, I am going to watch the video tapes, and I am going to draw my own conclusions. No one is going to tell me that there was any other kind of touching. I am not going to make any assumption that there was any other kind of touching.... But it is the case, as Major Sarver indicates, that even though a touching of the child is not included in any of the elements of the offense, that if there were evidence in any form to suggest that might have accompanied the offense, that does not per se constitute inadmissible evidence, it can be evidence directly relating to the facts and circumstances of the offense; aggravation evidence that can come in if it is otherwise admissible, during the course of presentencing phase of the trial. So I am not going to cut it off at this point on

the basis of what I've heard, I'm going to allow the testimony and then I am going to disregard any testimony at the end of it all that I regard as not worthy of my consideration.

Soon thereafter, Goldstein offered the opinion that some of the photographs indicated "physical touching." Civilian defense counsel offered "a continual objection to any ... testimony that" the child had "been touched in the vaginal area, or any other way that is other than normal."

Subsequently, Goldstein testified that whether "a preferential child sex offender" is "a danger to the community" "depends on the sophistication of the offender." Testifying in relation to some of the photographs that showed mutilated children, the witness opined that "a preferential child sex offender with a fantasy about the mutilation of young children" would be "a danger to the community," because "the potential for violence is there." He believed that "the jury is out as to whether or not we have a cure" for child molesters.

## II

Before the Court of Military Review, Talbert "complain[ed] that the military judge erred to his substantial prejudice by admitting inadmissible expert opinion evidence concerning a child sexual abuser profile." The court below observed that "no objection [had been] registered at trial by appellant," so it found a "waive[r] by failure to object," and did "not find plain error in the absence of the objection." Unpub. op. at 2, 1989 WL 159445. We come to a similar conclusion.

Although from time to time the defense made objections to specific portions of the expert testimony offered by Clark and Goldstein, no challenge was ever made to their expertise. Moreover, at no time did the defense challenge their opinion that a person who collected a videotape and photographs like those seized from appellant was "a preferential child sex offender" and "a pedophile." Indeed, there would have been little point in contesting that appellant was "a pedophile" in light of the compel-

ling evidence that logically could lead only to that conclusion. Even appellant acknowledged as much when he later testified: "I don't want to say it, I hate to admit it, but I am [a pedophile]. The evidence proves it."

We infer that the defense made a tactical choice not to object to the expert testimony but to try to use it in some way to appellant's advantage. Talbert candidly admitted that he was "a pedophile"; but by stating that he wanted to get the necessary cure, he apparently hoped that the judge would consider him a better candidate for rehabilitation and so would be more lenient. To this end, Talbert also testified that he knew he would be confined but that he "hope[d] they confine me and put me in a program where I at least have the opportunity for treatment.... If they say that I'm not cured, then I don't want to come out. I don't care if you put me in for—whatever, until the doctors say I'm ready to come out. They are supposed to be the experts, if anybody is."

On the other hand, not only did the defense object to Goldstein's testimony—based on the photograph—that one of the little girls had been touched, but also Talbert specifically testified that he had never touched any of his victims "in an unnatural or abnormal way in a place little girls shouldn't be touched." The selective nature of the defense objections makes it even clearer that the failure to object to any profile testimony was not inadvertent and so should be treated as a waiver. Furthermore, there is no reason to relieve appellant of the waiver where the alleged "plain error" consists of admitting evidence which apparently the defense was perfectly willing for the military judge to consider.

See Mil.R.Evid. 103(a)(1) and (d), Manual for Courts–Martial, United States, 1984.

■ Concerning receipt of the testimony to which defense objections were offered, we perceive no prejudicial error. Art. 59(a), UCMJ, 10 USC § 859(a). The closest issue involves Goldstein's testimony about the touching—which had not been alleged. However, as the military judge observed, evidence of touching would be proper evidence in aggravation since it would directly relate to the indecent-liberties offenses. See United States v. Thomas, 11 MJ 388, 392–93 (CMA 1981). Furthermore, it seems clear from the comments of the military judge that he did not intend to place great weight on the touching for sentencing purposes, even if he determined that some touching had occurred.*

Finally, we note that, in view of the massive aggravating evidence against Talbert, it is unlikely that the expert testimony enhanced his sentence significantly. To whatever extent it did so, any prejudice undoubtedly was removed by the Court of Military Review, when it slashed the sentence to confinement in half.

In closing, we emphasize that the evidence which is the subject of this appeal was offered as to sentence, rather than as to findings, and was never objected to at trial. Under other circumstances, admissibility of this opinion evidence might be much more questionable.

III

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judge COX concur.

---

* Since the sentencing was done by a military judge, rather than by court members, there is less likelihood the accused would be prejudiced

by consideration of inadmissible evidence. See United States v. Harper, 22 MJ 157, 164 (CMA 1986).